20   429
8l18 20¼

No. 79.—ELIZA J. SCOTT, plaintiff in error, *vs.* ISAAC WIN-SHIP, defendant.

[1.] In all cases of claim, where the transaction is between relatives, especially a mother and her son, it is a fact of vital importance that the *bona fides* of the consideration upon which it purports to be founded, is not disputed.

[2.] Where property is fairly purchased from a debtor in failing circumstances, and the money paid, the creditors must refund the price paid before they can re-sell on account of the inadequacy of the price, unless it be so grossly inadequate as to amount to a fraud *per se.*

[3.] Where personal property is absolutely conveyed, and a verbal agreement be entered into th t the property shall remain in possession of the vendor upon the performance of certain conditions, although the stipulation may not amount to a valid contract; still, it may be sufficient to explain

the continued possession, and thus rebut the presumption of fraud arising therefrom.

[4.] The rule, that the sale of the whole of an insolvent debtor's property is a badge of fraud, does not apply in a contest between the creditors and one who has purchased a very inconsiderable portion thereof; and especially when enough was left, at the time, to pay the debts.

[5.] A bill of sale unattested, will be presumed to have been executed on the day it bears date.

[6.] When there is conflicting testimony, and especially if there be any thing like an equiponderance of evidence, it is error in the Court to charge the Jury that they are *bound* to find a particular way.

[7.] Proof of the payment of a valuable consideration for property, rebuts the presumption of fraud arising from the continued possession by the seller.

[8.] The fraudulent attempt by the judgment debtor to run off property supposed to be subject, cannot prejudice the claimant unless she was privy to it.

Claim, in Bibb.    Tried before Judge Powers, May Term, 1856.

Isaac Winship having obtained a judgment against William B. Scott, at the Nov. Term, 1854, of Bibb Superior Court, subsequently caused a *fi. fa.* founded thereon to be levied on two slaves, as the property of the defendant.

A claim having been interposed by Eliza J. Scott to the property levied on, an issue was formed, and upon the trial, the plaintiff in *fi. fa.* introduced proof as follows:

The *fi. fa.* above mentioned being for principal debt, $660, and the levy thereon. An agreement, signed by claimant's Counsel, admitting that the defendant in *fi. fa.* had possession of the property levied on after said judgment was obtained.

William Holmes testified, that negroes of the age of those levied on, were worth, at the time of the levy, twelve or thirteen hundred dollars.

The Sheriff of Troup County, by interrogatories, proved that he knew Isaac Winship; did not know claimant. As Sheriff of Troup County, he levied on two negroes as the pro-

perty of defendant, on the cars of the LaGrange & Atlanta Rail Road in Troup County; they were going West. The negroes levied on, together with several others, were in possession of a young man whom he did not know. The description of the negroes corresponds with that embraced in the levy on the *fi. 'fa.*

Plaintiff here rested his case.

Claimant then offered in evidence, after proving the signature of William B. Scott, a bill of sale dated June 22d, 1853, a copy of which is as follows:

"Received of Eliza J. Scott Three Thousand Dollars, in full payment for the following named negroes: Jim and his wife; Silvey and her three youngest children; also, Toney and his wife Barbary; also, Dave and his wife Hagar. The titles to the above named negroes I warrant to be good. Bibb County, June 22d, 1853.  WM. B. SCOTT."

Claimant then put in evidence the following deeds and conveyances:

A deed from Mrs. Eliza J. Scott to Robert Freeman, C. A. Hamilton, Eleanor Scott and Wm. B. Scott, (the defendant in *fi. fa.*) dated the 8th day of Dec 1852, stipulating that in consideration of the sum of $287 50, which each one of the grantees was to pay her annually during her life, and which they were to secure by mortgages on unincumbered property, she released and conveyed the plantation recently occupied by the late Wm. Scott, now deceased, in Bibb County, known as William Scott's plantation, on Tobesofka Creek; also, Nancy Wise and her two children; Charles, a man, and Harrison a boy, slaves; the said property being the part received by her as a life estate, under the will of her husband, the said William Scott, deceased; remainder, to above named children; and in which deed there was a clause of defeasance, in the event the said security was not given.

A mortgage from Robert Freeman, of the above date, to secure his part of said annuity of $287 50. A mortgage

from C. A. Hamilton, of the same date, for the same purpose; and also, a mortgage, of the same date, from Robert Freeman, to secure a like annuity from Eleanor Scott, (who was a minor, said Freeman being the executor of William Scott, deceased, and guardian of said minor.)

RICHARD A. BENSON testified, that claimant was entitled, under the will of William Scott, deceased, to a life estate in the property conveyed by her to Robert Freeman and the other children; that in order to facilitate the winding up of said estate, it was agreed between claimant and the other legatees (children of claimant) under said will, that claimant should release her said life interest; and that in consideration thereof, the other parties should each pay to her an annuity of $287 50, during her life, and to secure the payment of the same, by mortgage on unincumbered property. All the parties gave mortgages except William B. Scott. The matter, so far as he was concerned, so remained until about June, 1853, when said William B. Scott agreed, in lieu of paying an annuity of $287 50, and executing a mortgage to secure the same, to make a bill of sale to claimant to the negroes mentioned in the bill of sale, dated June 22d, 1853, (which negroes are valued at $3.000,) in full discharge of said annuity. Witness does not recollect distinctly whether he was present when said bill of sale was made, but thinks he was; was present at several settlements between the legatees in winding up the affairs of said estate; cannot state, positively, that he was present at the making of the bill of sale; at all events, knows that it was made in discharge of the annuity, and in lieu of making the mortgage; recollects seeing the bill of sale a short time after it was made. Witness is the son of claimant. At the time the bill of sale was made, the negroes mentioned therein were in possession of Robert Freeman, who had hired them, and were not delivered to claimant at the time the bill of sale was made. It was the understanding between the claimant and William B. Scott, that as Mrs. Scott had no use for the negroes, and was only desirous of securing the annuity due her by said William B. the ne-

groes might remain in his possession; and if he continued regularly to pay the annuity, his possession should not be disturbed. This understanding was a verbal one; it was also verbally understood, that if said William B. Scott should continue punctually to pay said annuity, said bill of sale might be defeated. Said Wm. B. never paid any portion of said annuity, after the execution of said bill of sale, and has never paid any of it since.

He considers $3.000 as a fair price for the negroes mentioned in said bill of sale, with all of whom he was acquainted; and considering the age, good health, &c. of claimant, did not think $3.000 too much to be paid in discharge of said annuity; considered it a reasonable amount. The negroes remained in possession of William B. Scott some months after the sale; thinks he carried them with him up to Cherokee, Ga. some time thereafter; thinks Jim was worth from $800 to $1.000; Silvey $600 to $700; her eldest child $300 to $400; the next eldest $300; the youngest about $300; Toney, $700; Barbary about $300; Dave and Hagar, old and infirm, worth something to take them.

William B. Scott had sold, in December before making the bill of sale, the homestead to Robert Freeman; he also sold his plantation to the same person, about the time of making the bill of sale. The two places were worth some $16.000 to $18.000. He had a negro man not included in the bill of sale, and which he still continued to own. He owed some debts at the time he made the bill of sale; don't know how much he owed; thinks he was indebted to plaintiff and several others; don't know what he did with the proceeds of sale of said lands; heard that he was in debt; don't know to what extent; had no doubt that at the time the bill of sale was executed, he had plenty to pay his debts, apart from the negroes embraced in said bill of sale; claimant is between fifty and sixty years of age.

The Court having charged and refused to charge the Jury, as will below appear, a verdict was returned finding the property subject, and *ten per cent.* damages.

Counsel for claimant thereupon moved a rule for a new trial, on the following grounds :

1st. Because the verdict of the Jury is contrary to law and the evidence in said case.

2d. Because the verdict is against the weight of evidence, especially in finding damages against claimant.

3d. The Court erred in charging the Jury that " the sale of the whole of one's property is a badge of fraud as against creditors," there being no evidence to sustain such charge.

4th. Because when the Court was requested in writing by claimant's Counsel to charge, that " if the Jury believed that William B. Scott executed a bill of sale to the property levied on to the claimant on the 22d of June, 1853, and the sale was made in good faith and without any design to defraud creditors, they will find in favor of claimant ;" the Court said it would give that in charge, but told the Jury, that " although the bill of sale purported to have been made on the 22d June, 1853, they might still find from the circumstances developed in the evidence, that it was not in fact made at that time, but at some subsequent time ; they might even believe it was not made until after plaintiff obtained his judgment ;" which was error, there being no evidence upon which to predicate such a charge.

5th. The Court erred in refusing to charge in the language of the written request of Counsel for claimant, to wit : " that although William B. Scott may have retained possession of the negroes after he executed the bill of sale to claimant, yet, that makes out a *prima facie* case merely of fraud, and is by no means conclusive evidence of fraud. On the contrary, the claimant may explain why William B. Scott was permitted to retain possession, and if the explanation is reasonable and satisfies the Jury that there was no intention to defraud any one, the Jury will find in favor of claimant."

6th. Because the Court erred in refusing to charge in the language as requested in writing, that " if the Jury believe that the claimant had a just claim against William B. Scott at the time the bill of sale was executed, and that the bill of

sale was taken to secure the payment of said claim, and not to defraud creditors or any one else, the transaction was *bona fide*, and they will find for claimant, notwithstanding the possession did not accompany the delivery of the bill of sale." The Court told the Jury "that there must be other circumstances going to explain defendant's possession of the property sold other than those specified in the request; otherwise, the Jury would be obliged to find the transaction fraudulent and subject the property."

7th. Because the Court erred in refusing to charge in the language as requested in writing, that "if the Jury believe that the claimant paid a valuable consideration for the negroes levied on, this rebuts the presumption of fraud raised by the possession remaining in William B. Scott.

8th. Because the Court erred in refusing to charge as requested in writing, that "if the Jury believe that the bill of sale was absolute, but there was a verbal understanding that it might be defeated by paying punctually the annuity, and the Jury believe that William B. Scott failed to pay said annuity and to comply with said right of defeasance, the bill of sale becomes and remains absolute"; the Court, on the contrary, charged "that if the Jury believe that although the bill of sale was absolute on its face, there was a private understanding between the parties, that if William B. Scott would continue to pay the annuity, the bill of sale was to be a nullity, this was a positive fraud in law and vitiated the whole transaction."

The Court over-ruled the motion on all the grounds, and claimant excepted.

LANIER & ANDERSON; STUBBS; HILL; TRACEY, for plaintiff in error.

A. M. SPEER, *contra.*

*By the Court.*—LUMPKIN, J. delivering the opinion.

The fundamental fact which lies at the bottom of this case,

and which is worth more than all others in such cases is, that there was, *ex concesso*, a consideration for this transaction. It is not pretended but that the annuity of $287 50 was owing by William B. Scott to his mother ; and there is no proof or attempt at proof that it has ever been paid.

If the negroes—bought of her son to extinguish this annuity—were more than it was worth, let the creditors stipulate for its payment, take the property or obtain a decree in Equity to re-sell the negroes for these purposes.

And then, that she should have permitted them to remain in her son's possession, under the parol agreement that they could continue there so long as he discharged the annuity, is there anything wrong in this ?

Suppose this verbal understanding be not a valid and binding contract, is it not sufficient to explain the possession, and thereby rebut the inference of fraud ?

Upon the whole, we think the verdict was decidedly contrary to the evidence and the weight thereof, especially as to the damages.

[2.] That the Court erred in charging the Jury " that the sale of the whole of one's property is a badge of fraud, as against creditors," the evidence showing that Scott had not sold the whole of his property at the time he made the bill of sale to his mother ; and that the claimant had only bought a comparatively small portion of it.

[3.] In charging the Jury that they " might believe, from the circumstances that the bill of sale purporting to have been made from the defendant to the claimant, was not executed on the 22d day of June, 1853, when it bears date, but at some subsequent time, even after the plaintiff obtained his judgment," there being not only no proof to authorize the charge, but the testimony being strongly the other way.

[4.] In charging the Jury, that unless there were other circumstances than those relied on in the sixth request of defendant's Counsel, that the Jury were " *obliged* to find the transaction fraudulent and the property subject." Whereas, the Jury should have been left to form their own independ-

Scott *vs.* Winship.

ent judgment upon the proof; and in the opinion of this Court, so far from being *bound* to condemn the property upon the facts assumed in the request, the Jury would have been fully justified in returning a verdict for the claimant.

[5.] In refusing to charge the Jury that if they believed claimant paid a valuable consideration for the negroes levied on, this rebuts the presumption of fraud arising from the continued possession of William B. Scott. Will it be pretended that if Mrs. Scott paid to her son a valuable consideration for the property in dispute, that her permitting it to remain with her son, would subject it to antecedent or pre-existing debts? Such is not our understanding of the law. And the day is distant, we hope, when humanity and all the holiest feelings of maternity should be outraged by the establishment of such a rule!

[6.] The charge, as given in the 7th request, varies materially, though unintentionally, no doubt, the instructions asked. The instructions asked were as to a *verbal* understanding between the parties; the charge, as given, has reference to a *private* understanding.

[7.] Whether the failure on the part of William B. Scott to comply with the verbal understanding between him and his mother abrogated the defeasance and converted the bill of sale into an absolute conveyance or not, we insist that it was competent evidence to explain the possession and rebut the presumption of fraud arising therefrom.

[8.] That William B. Scott may have attempted to have run off these negroes, or a portion of them, with a view to cheat either his mother or creditors, or both, is quite possible; but unless his mother knew of it and connived at it, it cannot prejudice her title or cast supicion upon the *bona fides* of the sale from her son to her. One thing is certain, there stands her annuity unpaid and unprotected, except by this sale.